**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**

File Name: 19a0499n.06

Case No. 19-1655

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| YORK RISK SERVICES GROUP, INC. | ) | |
| | ) | **FILED** |
| Plaintiff–Appellee, | ) | Sep 27, 2019 |
| | ) | DEBORAH S. HUNT, Clerk |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN |
| | ) | |
| JOHN COUTURE, | ) | |
| | ) | |
| Defendant–Appellant. | ) | |

**BEFORE:  GUY, BUSH, and MURPHY, Circuit Judges.**

**JOHN K. BUSH, Circuit Judge.**  This appeal involves an area of law having its roots in an eighteenth-century English bakery dispute.  In the early 1700s a baker named Mitchel leased his space to another baker and as part of the deal, agreed not to open another bakeshop in town for the term of the lease.  Prior to this case, English common law had not enforced non-compete agreements, deeming them to be *per se* illegal restraints of trade.  *Mitchel v. Reynolds,* 24 Eng. Rep. 347 (1711) changed all that.  Close to two centuries later, then-Sixth Circuit Judge William Howard Taft would write, in an opinion first recognizing the "rule of reason" doctrine under the Sherman Act, that *Mitchel* "laid down the rule that" a non-compete agreement may be enforced provided "the restraint was not general, but particular or partial, as to places or persons, and was upon a good and adequate consideration, so as to make it a proper and useful contract."  *United*

*States v. Addyston Pipe & Steel Co.*, 85 F. 271, 283 (6th Cir. 1898), *aff'd as modified*, 175 U.S. 211 (1899).

The present appeal concerns insurance, rather than baked goods, but the same principles of law that find their genesis in *Mitchel* apply, as they have developed over more than three centuries of jurisprudence. John Couture appeals the district court's grant of a preliminary injunction in favor of his former employer, York Risk Services Group (York), based on non-compete, as well as non-solicitation and confidentiality, contractual provisions. After several years at York, Couture joined McLarens, one of York's direct competitors. York brought suit, seeking a preliminary injunction to enforce the restrictive covenants contained in Couture's stock-option contract that the parties executed when Couture first received stock options from York. Just as Mitchel's receipt of benefits from the bakery lease and other facts permitted a non-compete agreement, so too did Couture's receipt of benefits from the stock options allow the restrictive covenants in the circumstances presented here. Under the governing law the district court committed no reversible error in holding that York demonstrated the requisite factors to obtain injunctive relief. Accordingly, we AFFIRM the district court's preliminary injunction granted York to enforce its agreement with Couture.

## I.

Couture joined York in September 2005 as a National General Adjuster, and during his tenure he rose through the ranks to the position of Vice President of Field Operations in the Specialized Loss Adjusters Division. Couture first acquired stock options in 2011 conditioned upon his signing a restrictive covenant. The stock-option contract was between Couture and York's parent company, Onex York Holdings Corp., a Delaware corporation. At issue in this appeal are

three provisions of this restrictive covenant, specifically provisions for non-competition, non-solicitation, and confidentiality.

The non-compete restriction provided that Couture would not, for a period of one year after termination of his employment with York:

> Directly or indirectly, own (beneficially or otherwise), manage, operate, control, participate in, or render services for (including as a consultant or advisor) for any Person that is engaged in (or provide financial assistance to or otherwise be engaged in any manner in the operation of) any business that offers any product or service that competes with any product or service that is offered by the Company.

The non-solicitation restriction provided that, for the duration of his employment with York and for two years thereafter, Couture would not solicit any of York's employees to terminate their employment with York and become an employee of a competitor, or solicit any of York's customers on behalf of another company. The confidentiality provision further prohibited Couture from disclosing any of York's proprietary information to anyone outside of York, or otherwise using any of York's proprietary information for the benefit of himself or any other third party.

Couture worked for York for thirteen years, most recently as the Vice President of Field Operations in the Specialized Loss Adjusters Division, where he oversaw the operations of twenty-five adjusters and two certified public accountants. Things changed on November 12, 2018, when Couture began working at McLarens, a competitor of York, as Vice President of Field Operations. On November 16, 2018, after four days of employment overlap at the two companies, Couture's employment with York ended. Couture occupied the same position at McLarens as he had at York, both in title and in responsibility, managing catastrophic claims adjusters and certified public accountants. In addition to these duties, Couture also assumed responsibilities at McLarens for interviewing and hiring. After Couture started at McLarens, seven York employees, all of whom

3

reported to or had contact with Couture, left to join McLarens. Several of them brought open accounts and business from York.

When Couture resigned from York, his immediate supervisor was Senior Vice-President Jim Stanilious. Stanilious remained in that position until mid-February 2019, when Victor Podesva succeeded him. During the period after Couture left York and while Stanilious was senior vice-president (between November 2018 and January 2019), no action was taken to enforce the restrictive covenants. However, in mid-March 2019 (after his appointment as Stanilious's successor), Podesva learned of, and sought to enforce, the restrictive covenants.

On May 1, 2019, York brought suit in the United States District Court for the Western District of Michigan, notwithstanding that the choice-of-forum clause in the stock option agreement required that any litigation be brought in New York, but Couture never objected to the location of the case. York sought to enjoin Couture from continuing his employment with McLarens for the duration of the non-compete agreement, from soliciting York employees and business for the duration of the non-solicitation agreement, and from violating the confidentiality provision. The district court granted York's motion for a preliminary injunction, enjoining Couture from: (1) any form of employment that engages in direct or indirect competition with York, (2) directly or indirectly soliciting York's employees or customers, (3) directly or indirectly diverting or attempting to divert business from York, and (4) disclosing any of York's confidential or proprietary information. Couture filed a timely appeal.

**II.**

"District courts assess four factors in analyzing a preliminary injunction issue: (1) whether the plaintiff has a strong likelihood of succeeding on the merits; (2) whether the plaintiff will suffer irreparable injury absent the injunction; (3) whether issuing the injunction will cause substantial

harm to others; and (4) whether the public interest will be furthered by the issuance of the injunction." *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000) (citing *Blue Cross & Blue Shield Mut. of Ohio v. Blue Cross & Blue Shield Ass'n*, 110 F.3d 318, 322 (6th Cir. 1997)). A court should balance all four factors, not necessarily giving dispositive weight to any one factor over the others. *See Gonzales*, 225 F.3d at 625.

We review "the district court's ultimate determination as to whether the four preliminary injunction factors weigh in favor of granting or denying preliminary injunctive relief" for abuse of discretion. *Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 760 (6th Cir. 2005). Under this standard, "we review the district court's legal conclusions *de novo* and its factual findings for clear error." *Certified Restoration Dry Cleaning Network L.L.C. v. Tenke Corp.*, 511 F.3d 535, 541 (6th Cir. 2007) (quoting *Jones v. City of Monroe*, 341 F.3d 474, 476 (6th Cir. 2003)). The standard is deferential, but this court may reverse the district court if it improperly applied the governing law, used an erroneous legal standard, or relied upon clearly erroneous findings of fact. *NAACP v. City of Mansfield*, 866 F.2d 162, 166–67 (6th Cir. 1989).

The district court held that the noncompete agreement between York and Couture was valid and that York was likely to succeed on the merits. It further found that "based on the proofs here, irreparable harm has been shown," R. 15 at PageID 285, and that the final two factors also weighed in favor of granting the preliminary injunction.

Couture advances three alleged errors on the district court's part, which we address in the following order: (1) the district court erroneously concluded that York is likely to succeed on the merits because York is not seeking to protect a legitimate business interest with this lawsuit; (2) the district court erroneously concluded that York would suffer irreparable harm based solely on the language to that effect in the parties' agreement; and (3) the delay between the end of Couture's

employment at York and York's bringing suit negates a claim of irreparable harm. We consider these arguments only as they pertain to the non-compete clause, for Couture does not raise any arguments on appeal relating to the non-solicitation and confidentiality clauses.[1]  Further, we do not address the other two factors for entering the preliminary injunction—*i.e.,* harm to others and public interest—because Couture does not appeal the district court's finding that they were established.

A.      Likelihood of Success on the Merits

A party seeking a preliminary injunction must show that it has demonstrated "a strong likelihood of success on the merits." *Tumblebus, Inc.*, 399 F.3d at 760.  Although a party is not required to prove its case in full at a preliminary injunction hearing, a plaintiff "must show more than a mere possibility of success." *Six Clinics Holding Corp. v. Cafcomp Sys., Inc.*, 119 F.3d 393, 402 (6th Cir. 1997).  Whether York is likely to succeed on the merits is an issue of substantive state law, which we review *de novo*. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *S. Glazer's Distrib. of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 849 (6th Cir. 2017).

Under the terms of Couture's stock-option contract, Delaware law governs all matters relating to the construction, validity, and performance of the contract.  The choice-of-law rules of the forum state (Michigan), which we must apply in this diversity case, *Banek Inc. v. Yogurt Ventures, U.S.A., Inc.*, 6 F.3d 357, 361 (6th Cir. 1993) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 490 (1941)), favor enforcement of contractual choice-of-law provisions. *Turcheck v. Amerifund Fin., Inc.*, 725 N.W.2d 684, 688 (Mich. Ct. App. 2006).

---

[1] Couture raised an argument addressing the solicitation clause for the first time in his reply brief. When a party fails to raise an argument in his opening brief, he forfeits the argument before this court. *See Miller v. Admin. Office of the Courts*, 448 F.3d 887, 893 (6th Cir. 2006).

Specifically, Michigan courts follow § 187 of the Restatement (Second) of Conflict of Laws, under which a choice-of-law provision will be enforced unless:

> the chosen state has no substantial relationship to the parties or the transaction, or when there is no reasonable basis for choosing that state's law. Section 187(2)(b) bars the application of the chosen state's law when it "would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which . . . would be the state of the applicable law in the absence of an effective choice of law by the parties."

*Chrysler Corp. v. Skyline Indus. Servs., Inc.*, 528 N.W.2d 698, 703–04 (Mich. 1995) (quoting Restatement (Second) of Conflict of Laws § 187(2)). The key inquiries are therefore: (1) whether there is "substantial relationship" between the lawsuit and the state whose law was designated by the choice-of-law provision to govern the dispute, and if there is not, (2) whether there is nonetheless a "reasonable basis for choosing that state's law." *Id.* at 704.

At first glance, Delaware law seems not to have a substantial relationship with either party, rendering suspect whether Michigan would allow for enforcement of the choice-of-law provision. Neither of the parties appears to have any tie to Delaware: York is a New York Corporation with its principal place of business in New Jersey, and Couture resides and is domiciled in Michigan. Nor does any part of the dispute appear to arise in Delaware. However, the stock option contract on which this litigation is based was between Couture and York's parent company, Onex York Holdings Corp., which is a Delaware Corporation. Further, the contract provides that both Onex York Holdings and its subsidiaries may seek injunctive or equitable relief to enforce the restrictive covenants contained therein. These facts are sufficient to demonstrate that York, through its relationship with its parent company, Onex York Holdings, has the requisite link to the State of Delaware. Although we located no Michigan state court decisions on point, case law from other jurisdictions interpreting the "substantial relationship" and "reasonable basis" rationales of section 187(2) of the Restatement have found that facts analogous to those presented here satisfy either

7

rationale and thus warrant enforcement of a choice-of-law provision.[2] Therefore, we apply Delaware law to determine whether York is likely to succeed on the merits of its claim.

Under Delaware law, when a party seeks to enforce a covenant not to compete, the court must undertake two inquiries: first, whether the covenant itself is valid under general contract principles; and second, whether the party seeking to enforce the covenant has a legitimate economic interest in its enforcement. *See McCann Surveyors, Inc. v. Evans*, 611 A.2d 1, 4–5 (Del. Ch. 1987).

As to the first inquiry, the district court found that the covenant at issue was valid and that its geographic and temporal restrictions are reasonable, a finding Couture does not challenge on appeal. *See* R. at PageID 286; *see also McPherson v. Kelsey*, 125 F.3d 989, 995 (6th Cir. 1997) (quoting *Citizens Awareness Network, Inc. v. United States Nuclear Regulatory Comm'n*, 59 F.3d 284, 293–94 (1st Cir. 1995) ("[I]ssues averted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.")

Regarding the second inquiry, the district court found that York has a legitimate economic interest in enforcing the covenant, as evidenced by Couture's experience, reputation, and

---

[2]Applying the "substantial relationship" rationale, the Maryland Court of Special Appeals in *Falls v. 1CI, Inc.*, 57 A.3d 521 (Md. Ct. Spec. App. 2012), enforced a choice-of-law provision calling for application of Alaska law. Even though in *Falls* the plaintiff was a Maryland resident and the defendant was a Delaware corporation, the court found a substantial relationship of Alaska to the parties, given that the defendant was the subsidiary of an Alaska corporation. This reasoning supports a finding of a substantial relationship to Delaware here, given that York's parent company is incorporated in Delaware.

As for the "reasonable basis" rationale, we find instructive *Gen. Retirement Sys. of City of Detroit v. UBS, AG*, 799 F. Supp. 2d 749 (E.D. Mich. 2011), in which the court, engaging in a Michigan choice-of-law analysis, found that a contractual choice-of-law provision providing New York law was enforceable despite neither party having a relationship with New York. 799 F. Supp. 2d at 756–57. In that case, the plaintiffs were residents of Michigan and the defendants were global entities without any particular connections to New York. *Id*. Despite the absence of any connection to New York, the court nonetheless enforced the provision, holding that "[w]hile New York may not have a substantial relationship to the parties, New York does have a highly developed body of commercial law, so it is reasonable in cases of complex financial transactions for parties domiciled in different states to elect New York law to govern their disputes. There is a reasonable basis for the parties' choice of New York law in this case." *Id*. at 757. Likewise, there is a reasonable basis to apply the law of Delaware to this business dispute given the well-developed body of commercial law in that State.

connections in a personalized business, and that he was brought to McLarens to increase the robustness of its business in the same area in which he worked at York. *See* R. at PageID 286–87. Under Delaware law, the protection of client goodwill and safeguarding of confidential information "have long been recognized as legitimate economic interests of a former employer." *Tristate Courier and Carriage, Inc. v. Berryman*, No. 20574-NC, 2004 WL 835886, at \*10 (Del. Ch. Apr. 15, 2004). This is especially true where "testimony showed that the … business is a competitive business and that personal contacts are critical to the success or failure of the venture." *Id*.

We agree with the district court that the non-compete covenant is likely valid under Delaware law and that York has a legitimate economic interest in enforcing it. The testimony below demonstrated that the specialized loss adjusting business is highly personalized and that Couture was a major player in that business. Under Delaware law, York undoubtedly has a legitimate economic interest in protecting customer goodwill and proprietary information, particularly given the competitive, personalized nature of the insurance adjusting business. *See id.* York therefore is likely to succeed on the merits.

B.     Irreparable Harm

We also affirm the district court's determination of irreparable harm, which we review for abuse of discretion applying federal law. *Certified Restoration Dry Cleaning*, 511 F.3d at 550.[3] Couture devotes most of his argument to disputing this factor, contending that the district court placed undue weight on Section 9.4 of the stock-option contract, which provides:

---

[3] When analyzing the irreparable harm factor, courts sit in equity, rather than in law. It has long been the province of federal courts sitting in equity to apply a body of federal common law. *See Russell v. Southard*, 53 U.S. (12 How.) 139, 147 (1851) ("This being a suit in equity, . . . this court must be governed by its own views of those principles."). The Supreme Court reaffirmed this position in *Guaranty Trust Co. of N.Y. v. York*, noting that "[e]quitable relief in a federal court . . . must be within the traditional scope of equity as historically evolved in the English Court of Chancery . . ." 326 U.S. 99, 105 (1945).

> Each of the parties agrees that any breach of the terms of this Agreement will result in irreparable injury and damage to the other parties, for which there is no adequate remedy at law. Each of the parties therefore agrees that in the event of a breach or any threat of breach, the other party shall be entitled to an immediate injunction and restraining order to prevent such breach, threatened breach or continued breach, and/or compelling specific performance of the Agreement, without having to prove the inadequacy of money damages as a remedy or balancing the equities between the parties.

We need not decide if language in a contract presuming irreparable harm is sufficient to show irreparable harm, however, because the district court made other findings sufficient to make that showing here. The district court did not rely solely on Section 9.4 in finding irreparable harm. *See* R. 15 PageID 285 ("[B]ased on the proofs here, the irreparable harm has been shown not only by the contractual provision, which in and of itself may or not be sufficient.") At most, the court cited the contractual provision as one piece of evidence in support of a finding of irreparable harm, which is permissible. *Cf. Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1266 (10th Cir. 2004) (collecting cases). The district court also considered Couture's reputation in the field, the personalized nature of the business, and that both Couture and McLarens knew of the non-compete agreement, but nonetheless chose to continue their business.

This circuit has held that "[t]he likely interference with customer relationships resulting from the breach of a non-compete agreement is the kind of injury for which monetary damages are difficult to calculate." *Certified Restoration Dry Cleaning Network*, 511 F.3d at 550 (6th Cir. 2007). Indeed, "[t]he loss of customer goodwill often amounts to irreparable injury because the damages flowing from such losses are difficult to compute. Similarly, the loss of fair competition that results from the breach of a non-competition covenant is likely to irreparably harm an employer." *Id.* (quoting *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992)).

Based on this legal authority and the facts in their entirety as found by the district court, we find no abuse of discretion in the weight the district court accorded to Section 9.4 in finding irreparable harm.

C. Delay in Seeking the Preliminary Injunction

Finally, Couture argues that the six-month delay between the start of his employment at McLarens and the initiation of this lawsuit rebuts York's claims of irreparable harm. "An unreasonable delay in filing for injunctive relief will weigh against a finding of irreparable harm." *Huron Mountain Club v. U.S. Army Corps of Eng'rs*, 545 F. App'x 390, 397 (6th Cir. 2013) (quoting *Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg., Inc.*, 511 F. App'x 398, 405 (6th Cir. 2013) (finding that a six-year delay in seeking injunctive relief weighed against finding of irreparable harm)). The length of a delay in seeking injunctive relief is a factual determination made by the district court that we review for clear error. The district court found that York was responsible for a two-month delay in seeking this injunction, by faulting York only for the delay of Jim Stanilious, Couture's immediate supervisor at the time he left York.

Although a lengthy delay in seeking injunctive relief may weigh against a finding of irreparable harm, *Huron Mountain Club*, 545 F. App'x at 397, the district court did not abuse its discretion in finding that the delay was not unreasonable, and therefore did not weigh against a finding of irreparable harm. All delays in seeking injunctive relief are not unreasonable. *See, e.g. Grand Lodge, Fraternal Order of Police v. Labor Council Mich. Fraternal Order of Police, Inc.*, 38 F.3d 1215, 1994 WL 589569, at *2–3 (6th Cir. 1994) (unpublished table opinion) (holding that a two or three-year delay from the first occurrence of copyright infringement to the filing of the lawsuit was not unreasonable and did not mandate a ruling that irreparable harm did not exist); *see also, e.g. Chabad of S. Ohio & Congregation Lubavitch v. City of Cincinnati*, 363 F.3d 427, 436

(6th Cir. 2004) (finding that a six-month delay between a cause of action arising and seeking a preliminary injunction was not "sufficient grounds for a reversal of the district court's decision to grant the preliminary injunction"). At most, York's delay was six months, which we find would not be unreasonable.

Therefore, the district court did not abuse its discretion when it concluded that York faced irreparable harm despite having waited months to file the lawsuit.

### III.

We determine, as did the district court, that York is likely to succeed on the merits. We also find no abuse of discretion in the district court's finding of irreparable harm. Given these determinations, and that Couture does not dispute that the harm-to-others and public-interest factors also favor injunctive relief, we hold that the district court did not abuse its discretion in granting York's motion for preliminary injunction, and we **AFFIRM**.